THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,                )   No. CR20-127-RSL
                                          )
                    Plaintiff,            )
                                          )
            v.                            )   DEFENDANT'S SENTENCING
                                          )   MEMORANDUM
GARY BOWSER,                              )
                                          )
                    Defendant.            )
_____ )

## I.    INTRODUCTION AND RECOMMENDATION

Gary Bowser is the least culpable and only apprehended defendant from this indictment. He is also likely to be the only person convicted and sentenced in this case. His fugitive co-defendants, Max Louarn and Yuanning Chen, reside in countries which may not extradite them for prosecution.[1] To date the government has not indicted, or at least not publicly announced, indictments against the circumvention device developers or the resellers of these devices. Thus Mr. Bowser is left to take the full brunt of the government's argument that the Court must "send a message" of general deterrence by imposing a lengthy term.

_____

[1] Based on defense inquiries, Max Louarn appears to have an extradition matter pending before a court in France. In 1995, Mr. Louarn was convicted in federal court and sentenced to 68 months of imprisonment for a multi-million dollar conspiracy for fraudulent sale of calling cards. *See* Judgment, *United States v. Louarn*, No. CR94-456 (E.D. Va. Feb. 10, 1995).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Mr. Bowser was used by Max Louarn. Unlike his co-defendants, Mr. Bowser used his real identity on the website. He took all the risk, and reaped the smallest profit. The overall enterprise "generated at least tens of millions of dollars of proceeds from the sale of its circumvention devices." Dkt. 40 at 12 (plea agreement). Of these "tens of millions" in proceeds, Louarn and Chen must have made millions, while the unindicted developers and resellers of these circumvention devices made the rest. Mr. Bowser, who took no steps to hide his online identity, was paid $500 to $1000 a month over the course of seven years to maintain Louarn's websites and to promote his products. Based on a reconstruction of records provided in discovery, it is estimated that Mr. Bowser made a total of $320,000 over the seven years.

Mr. Bowser never met Louarn or Chen in person, and unlike other unindicted conspirators was not part of Louarn's social life, which included lavish vacations and parties. Mr. Bowser "met" Louarn after moving to the Dominican Republic to live an "ex-pat" life of semi-retirement. Unlike Louarn's lifestyle, Mr. Bowser lived a modest life in a modest apartment. Ex. 1 (photos of Bowser apartment).Then Mr. Bowser became involved in Louarn's enterprise after losing his relatively modest nest egg in a bad real estate venture.

Louarn created the enterprise from Europe, while Chen was responsible for manufacturing the devices that were designed and updated by developers who were paid handsomely for their services. The products were then purchased and sold by resellers, who were independent contractors. Mr. Bowser maintained websites which promoted and advertised the products, hosted forums, and provided customer support. Some of his $320,000 in income came from ad revenue generated from the independent resellers.

Mr. Bowser played a significant role, but he was not the leader, was not in control of the enterprise, and was not the manufacturer of the devices. Without Chen or

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Bowser*, CR20-127-RSL) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Louarn, there would be no enterprise. But without Mr. Bowser, Louarn would have found someone else to be "the face" of this effort.

Mr. Bowser has accepted full responsibility for his actions and has expressed sincere shame and remorse. He has pled guilty and taken the unusual step of accepting a consent judgment in his civil case with Nintendo before criminal judgment. *See Nintendo of America Inc. v. Gary Bowser*, No. C21-519-RSL, Dkts. 23–25. Mr. Bowser has already served a significant sentence by spending 16 months in pretrial detention under harsh conditions.

Recognizing the seriousness of this offense, Mr. Bowser's role, his history, his remorse, and the steps he has already taken toward rehabilitation, we ask the Court to impose a 19-month sentence of imprisonment.

## II.   MR. BOWSER'S HISTORY AND PERSONAL CHARACTERISTICS

The PSR captures much of the chronology of Mr. Bowser's life. PSR ¶¶ 62–97. Mr. Bowser grew up being home schooled while following his father's jobs and travelling through much of Canada and the United States. He led somewhat of a solitary existence as a child, and much of his education was through correspondence schools. He was a good student and eventually was drawn to computers, which became a lifelong passion. At a very young age, he began businesses related to computers, while at the same time helping to support his father who had since retired.

He created a successful business manufacturing interactive kiosks for the government in Toronto, Canada. Eventually that business closed when the city turned to a Microsoft-based platform and away from Texas Instruments, which Mr. Bowser used in his kiosks. In his personal life, he had many challenges. Not mentioned in the PSR is a girlfriend who was murdered. Mr. Bowser was also the victim of serious domestic violence at the hands of another girlfriend, which landed him in the hospital three times. PSR ¶ 71. Due to his early childhood raised on the road, and as an only child after his

older brother died in a plane crash, he never connected with his half-siblings. His mother died when he was 15, which led to his history of excessive drinking. And when his father passed, he was essentially alone with no real family. PSR ¶¶ 62, 67.

Interviews of friends and acquaintances who knew Mr. Bowser before and during his time in the Dominican Republic describe a man seeking friendship and often being taken advantage of financially by those around him. Tony Dociak, who met Mr. Bowser in Toronto in 1993, was his closest friend before Mr. Bowser left for the Dominican Republic. Ex. 5 (Memorandum of Dociak interview, filed separately under seal). Dociak, who only had sporadic contact with Mr. Bowser while he was living in the DR, described Gary as a very kind and caring individual. He describes Mr. Bowser's penchant for getting taken advantage of by customers at a computer repair store he ran, and also being taken advantage of by business partners in an earlier business he had started with another couple. *Id.* Mr. Dociak is willing to assist Mr. Bowser once he returns to Canada.

Shawna Berthelot, the Canadian ex-wife of Wilkins Feliz, the young man that Mr. Bowser considered a "step-son," describes her interactions with Mr. Bowser and what was reported to her by her late ex-husband. Ex. 6 (Memorandum of Berthelot Interview, filed separately under seal). Mr. Bowser paid all the expenses for Ms. Berthelot to travel to the Dominican Republic after Wilkins Feliz was seriously injured in a motorcycle accident, and then again paid for a second trip when Feliz died from an unrelated virus. She noted that Mr. Bowser "wanted to please people and be liked." *Id.* He refused to let her pay for anything on her two trips to the Dominican Republic. Ex. 2 (photos from the trip). She also observed how others had taken advantage of Mr. Bowser's kindness and generosity. She, too, has offered to help Mr. Bowser upon his return to Canada.

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Bowser*, CR20-127-RSL) - 4

In 2018, Mr. Bowser contracted elephantiasis (lymphedema), a lymphatic disorder likely from a mosquito bite, which caused morbid swelling of his left leg. Then when the COVID-19 pandemic set in, Mr. Bowser became depressed, began drinking more heavily, and gained a substantial amount of weight. And then his home was raided, his computers seized, and in an orchestrated expulsion from the Dominican Republic he was put on a plane to Canada, with a stop in New Jersey where federal agents arrested him on this indictment. He has been in custody ever since.

## III.    THE SENTENCING GUIDELINES

The defense arguments concerning the guideline calculation issues are set forth in portions of the attached letter to U.S. Probation. Ex. 3 (letter). During this presentence report review process, the government had asked for a manager or supervisor guideline adjustment, and the defense asked for a minor role adjustment. Probation ultimately determined that neither the increase for manager or supervisor nor the reduction for minor role should be granted. After a discussion with the government, we have agreed that neither party will be pressing or focusing on these specific guideline arguments but instead will focus attention on how Mr. Bowser's actions and role in this offense inform the § 3553(a) analysis of Title 18. Thus there are no guideline calculation disputes.

## IV.    WHY THE SENTENCING GUIDELINES LOSS TABLES ARE A POOR VEHICLE FOR CONSIDERATION IN DETERMINING AN APPROPRIATE SENTENCE

The stipulated 24-level increase in Mr. Bowser's guideline range for loss amount overstates the seriousness of this offense and his role in the offenses, and act as an imperfect measure for determining the appropriate punishment. Using this standard as the driving force fails to account for Mr. Bowser's relatively small gain of about $320,000 over seven years, when compared to the "tens of millions of dollars" in proceeds received by others, including millions by his co-defendants and many

1   hundreds of thousands of dollars, if not millions, by the unindicted developers and

2   resellers.

3         When determining whether a variance should be considered on this point, and

4   using Mr. Bowser's gain as an alternative measure for determining a variance, this

5   would result in a 12-level (not a 24-level) increase in the offense level. This would

6   bring Mr. Bowser's "guideline range" down to level 21 and, without a minor role

7   adjustment, to a range of 37 to 46 months.

8         Mr. Bowser's case is a prime example of why the fraud guidelines and their

9   reliance on loss amounts have long been criticized as a poor measure for determining an

10  appropriate sentence. *See* Mark W. Bennett, *Addicted to Incarceration: A Federal*

11  *Judge Reveals Shocking Truths About Federal Sentencing and Fleeting Hopes for*

12  *Reform* (April, 2018), *Federal Sentencing Reporter*, found at

13  https://ssrn.com/abstract=3156250 ("Perhaps the greatest consensus among federal trial

14  judges about the lack of empirical data to support a guideline is the fraud guideline. The

15  fraud guideline, 2B1.1, can result in a guideline range, in a fairly typical high-end loss

16  case, 'equal to first-degree murder and three times longer than "second degree

17  murder.''' There is simply no empirical basis to justify this ridiculous result, or for that

18  matter, any of the other thousands of fraud sentences informed by the fraud guideline

19  each year. I have never been able to find an empirical basis for even *one* of the dozens

20  of specific offense characteristics contained in the fraud guideline." *Id.* at 96.) As Judge

21  Jed S. Rakoff has written, the fraud guideline reflects "an ever more draconian

22  approach to white collar crime, unsupported by any empirical data." *United States v.*

23  *Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

24

25

26

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## V.     COMPARABLE DEFENDANTS TO MR. BOWSER IN SIMILAR TYPES OF CASES HAVE RECEIVED SENTENCES LESS THAN WHAT MR. BOWSER HAS ALREADY SERVED

In *United States v. Nomm*, a 36-year-old Estonian who waived extradition and pled guilty to "the largest criminal copyright case in U.S. History," in a scheme that involved the online sale of pirated movies, music, and other works, received an agreed sentence of one year and one day. *See* No. 1:12-CR-00003 (LO) (E.D. Va.), Dkt. 205f. The agreed loss amount exceeded $400 million. The DOJ press release emphasized that the group received at least $175 million in proceeds. Nomm was a participant in the conspiracy for five years. The government viewed his conviction and sentence as a "significant step forward" and vowed to pursue all the other defendants, and that Nomm's sentence reflected his acceptance of responsibility. Ex. 4 (DOJ Press Release). This case is instructive because the loss amounts and the total proceeds are greater than Mr. Bowser's case, Nomm participated almost as long as Mr. Bowser, and based on his acceptance of responsibility the government viewed that his sentence sent an adequate message of general deterrence. The same should be true here.

In *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008), the defendant received probation after a jury convicted him for a one-million-dollar violation of the Digital Millennium Copyright Act. His guidelines were 41 to 51 months. The Ninth Circuit upheld the probation sentence after a government appeal. Although the loss was one million dollars, Mr. Whitehead "personally earned over $400,000 from" the scheme. *Id.* at 994. While the overall loss amount in *Whitehead* is less than here, his personal gain was greater than Mr. Bowser's and he went to trial. Mr. Bowser is not asking for a probation sentence.

## VI.   MITIGATING CIRCUMSTANCES THAT SUPPORT A SENTENCE OF 19 MONTHS

### A.   The Relatively Minimal Gain Mr. Bowser Received from This Offense and His Role *Vis a Vis* Max Louarn and Yuanning Chen

Mr. Bowser was essentially a paid employee of Max Louarn, with the added benefit of keeping modest ad income from the website. Mr. Bowser did not have a proprietary role in the enterprise, and he did not have control over the manufacture of the circumvention devices. The amount of pay he received, and the exposure he had to arrest and prosecution, compared to Chen and Louarn, speaks loudly to the wide disparity in culpability.

Mr. Bowser is a person who wants to be liked, and his generosity is something that others have taken advantage of. In this case, Louarn used Mr. Bowser to be the public face of the enterprise, while Louarn remained in the background. It is now Mr. Bowser alone facing the brunt of this prosecution.

### B.   The Unusually Harsh Circumstances of His Confinement Over the Last 16 Months

The circumstances of Mr. Bowser's confinement are far harsher than most pretrial detainees with similar characteristics, charged with similar conduct, would suffer. This disparate and harsher confinement began with his initial detention and arrest. Because Mr. Bowser is a Canadian citizen with no status in the U.S. and no family resources in Canada, it was impossible to achieve his presumptive pretrial release. He has been detained since his initial appearance in New Jersey on October 2, 2020. By the time of sentencing, Mr. Bowser will have been confined for over 16 months in pretrial detention, much of it in lockdown or partial lockdown due to the COVID-19 pandemic.

The BOP medical records help to paint a picture of this long pretrial confinement. When Mr. Bowser first arrived at the Federal Detention Center, his elephantiasis caused him difficulty standing on his left leg and required either a

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Bowser*, CR20-127-RSL) - 8

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

wheelchair or cane. These problems continued into 2021 and are described in the records as a "permanent deform[ity]," which presented challenges for Mr. Bowser including some incidents of falling in his cell. Ex. 7 at 1–3 (BOP medical records, filed separately under seal). When he first arrived in BOP custody, he weighed 305 pounds. *Id.* at 4. Moreover, early in his confinement, Mr. Bowser contracted COVID-19 and had a number of serious symptoms associated with that virus, but he recovered after 10+ days in isolation without a need for hospitalization. *Id.* at 5.

Mr. Bowser did not sit around feeling sorry for himself. Instead, he has done his best to manage these physical challenges while incarcerated during a time of ongoing lockdowns. He reports that these efforts have paid off. He lost 100 pounds and no longer has high blood pressure. He tries to exercise and do physical therapy for his leg when he's not locked in his cell. And he has kept his mind sharp by reading self-help books and working on his case.

### C.   Any Sentence of Imprisonment that the Court Imposes Will Effectively Be at Least Double What a U.S. Citizen Would Actually Serve in Prison for the Same Term and Will Be Served Under Harsher Conditions than a U.S. Citizen.

As a Canadian citizen who is deportable, Mr. Bowser not only suffered through pretrial detention, he is at a disadvantage at every next stage of his sentence in BOP custody compared to similarly situated American citizen defendants who commit similar crimes. If Mr. Bowser had status in the United States, he would have been out of custody on an appearance bond and would likely be permitted to self-surrender for any prison term that the Court may impose; and like the defendant in *Whitehead*, *supra*, he could have used that time to make a further case for post-offense rehabilitation. He would almost certainly have then been designated to a minimum-security prison camp to serve his sentence. But, again, his status as deportable prevents his designation to a camp.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1     Those disparities also affect the length of time he will be confined if sentenced

2  to the same term that a non-deportable defendant would receive. Mr. Bowser would be

3  an excellent candidate for the recently implemented Earned Early Release program

4  created by the First Step Act. *See*

5  *https://www.bop.gov/inmates/fsa/docs/bop_fsa_rule.pdf*. Under the statute and the BOP

6  regulations, most non-violent offenders can earn 15 days of time-credits for every 30

7  days of successful participation in programming in the BOP. 18 U.S.C.

8  § 3632(d)(4)(A)((i) and (ii). That provision effectively provides the prisoner with a 50%

9  reduction in time spent behind bars. Those credits are then applied to prerelease

10  custody, e.g., time on home detention or in an RRC or on supervised release. However,

11  due to Mr. Bowser's deportability, he cannot be transferred to such prerelease custody,

12  and the statute prohibits him from earning those credits because he is now a "deportable

13  alien." *Id.* at § 3632(d)(4)(E).

14     Based on Mr. Bowser's diligent efforts at self-improvement under the harshest

15  of pretrial conditions, there can be little doubt that he wished to take full advantage of

16  the requisite BOP programming and would have been granted the full benefit from

17  those programs.[2]

18     Another program which would have enabled Mr. Bowser's release one year

19  earlier is the RDAP substance abuse program. He qualifies based on his long-time

20  abuse of alcohol (PSR ¶ 89), but cannot be released early because of his status as

21  deportable. When comparing Mr. Bowser to similarly situated non-deportable offenders

22  with the same imprisonment sentence, Mr. Bowser will serve twice as long in prison

23  custody, at a higher custody level, and will not be eligible for an additional year off for

24  RDAP.

25

26  [2] The statue gives very little discretion to the BOP. It provides that the BOP "shall
   transfer prisoners" to prerelease custody should they earn the credits through
   programming. 18 U.S.C. § 3632(d)(4)(C).

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Bowser*, CR20-127-RSL) - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1       If sentenced to a term greater than 19 months, Mr. Bowser's status will prevent

2 him from designation to a camp, and any future period of confinement will likely be in

3 a facility that houses BOP prisoners who are otherwise deportable, such as Mr. Bowser.

4 These are often private prisons under contract with BOP and have a bad reputation, for

5 among other things poor medical care. While the Biden Administration is currently in

6 the process of terminating these private prison contracts, it is unclear when these

7 facilities will no longer be utilized for this purpose. Currently, FPD has three Canadian

8 clients in three such facilities: McCrae CI in Georgia, Oakdale 1 FCI in Louisiana, and

9 North Lake CI in Michigan. (BOP Inmate Locator, last checked Feb. 3, 2022). This

10 combination of negative impacts, due solely to Mr. Bowser's status as a "deportable

11 alien," creates an extraordinary disparity which should be considered by the Court

12 under 18 U.S.C. § 3553(a)(6).

13       In addition to the statute, the case law permits the Court to consider such

14 disparities in determining an appropriate sentence. *See United States v. Navarro-Diaz*,

15 420 F.3d 581 (6th Cir. 2005) (in illegal reentry case with guidelines of 57–71 months,

16 case remanded because of *Booker* where district court noted defendant would be

17 punished more than citizen because not eligible for six months in halfway house at end

18 of sentence); *United States v. Davoudi*, 172 F.3d 1130 (9th Cir. 1999) (where defendant

19 convicted of making false statements to bank, district court had discretion to depart

20 downward because deportable alien may be unable to take advantage of minimum

21 security designation of the up to six months of home confinement authorized by 18

22 U.S.C. § 3624(c), but court's discretionary failure to do so not reviewable); *United

23 States v. Charry Cubillos*, 91 F.3d 1342, 1344 (9th Cir.1996) (same); *United States v.

24 Farouil*, 124 F.3d 838 (7th Cir. 1997) (where defendant charged with importing heroin,

25 district court may consider whether defendant's status as a deportable alien would result

26 in unusual or exceptional hardship in conditions of confinement that might warrant a

1  departure (ineligible for home detention, community confinement, work release,

2  intermittent incarceration, or minimum security designation)).

3  These cases are instructive for the legal authority they provide to the Court, but

4  also because the degree of disparity in the actual confinement portion of the sentence

5  for Mr. Bowser is far greater than found in the facts of the cases cited above. If the

6  Court were to impose a sentence of 19 months, Mr. Bowser would be confined in a

7  prison setting for the equivalent amount of time as if sentenced to 38 months or more as

8  a U.S. citizen.

9  **VII.   CONCLUSION**

10  This is a serious offense in which Nintendo suffered substantial monetary loss,

11  and which affected employees and those who develop games for Nintendo. A sentence

12  of 19 months for the least culpable of the three charged defendants, under the

13  circumstances in which Mr. Bowser has actually served that sentence, is significant.

14  And it is the equivalent of more than a 38-month sentence for a U.S. citizen with

15  similar personal characteristics and a similar role in this offense. For these reasons and

16  those set forth in all of the materials submitted to the Court, we respectfully request that

17  the Court impose a sentence of imprisonment of 19 months along with the conditions

18  recommended by Probation.

19  DATED this 3rd day of February 2022.

20

21  Respectfully submitted,

22  s/ *Michael Filipovic*
   Federal Public Defender

23

24  s/ *Christopher Sanders*
   Assistant Federal Public Defender

25

26  Attorneys for Gary Bowser

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**