```
 1                    UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3   _____
                                   )
 4   UNITED STATES OF AMERICA,      ) CR20-00127-RSL
                                    )
 5                 Plaintiff,       ) SEATTLE, WASHINGTON
                                    )
 6   v.                             ) February 10, 2022 -
                                    ) 10:00 a.m.
 7   GARY BOWSER,                   )
                                    ) SENTENCING HEARING
 8                 Defendant.       )
     _____

 9
                    VERBATIM REPORT OF PROCEEDINGS
10            BEFORE THE HONORABLE ROBERT S. LASNIK
                   UNITED STATES DISTRICT JUDGE
11   _____

12

13   APPEARANCES:

14   For the Plaintiff:       Brian D. Werner
                              U.S. Attorney's Office
15                            700 Stewart Street
                              Suite 5220
16                            Seattle, WA 98101

17                            Anand B. Patel
                              U.S. Department of Justice
18                            Criminal Division
                              1301 New York Avenue N.W.
19                            Washington, DC 2005

20

21   For the Defendant:       Michael Filipovic
                              Christopher Sanders
22                            Federal Public Defender's Office
                              1601 5th Avenue
23                            Suite 700
                              Westlake Center Office Tower
24                            Seattle, WA 98101

25            THE COURT:  Thank you.  Please be seated.
```

1          THE CLERK:  This is the matter of United States v. Gary

2    Bowser, Cause No. CR20-127, assigned to this court.

3       Counsel, please rise and make your appearances for the

4    record.

5          MR. WERNER:  Good morning, Your Honor.  Brian Werner

6    from the United States Attorney's Office, and Anand Patel from

7    the Computer Crime and Intellectual Property section of the

8    Department of Justice.

9          THE COURT:  Thanks very much, Mr. Werner and Mr. Patel.

10          MR. FILIPOVIC:  Good morning, Your Honor.  Michael

11    Filipovic and Christopher Sanders on behalf of Gary Bowser.

12          THE COURT:  Thank you, Mr. Filipovic, Mr. Sanders.

13    Welcome, Mr. Bowser.

14       We are here for sentencing on Mr. Bowser's pleas of guilty to

15    one count of conspiracy to circumvent technological measures and

16    to traffic in circumvention devices, that's Count 6, and Count 9,

17    trafficking in circumvention devices.

18       In preparation for the sentencing today, I have reviewed

19    many, many documents.  I have an excellent Presentence Report by

20    Officer Amelia Whaley.  Thank you very much.  Senior Probation

21    Officer Amelia Whaley.  I have attached to that the letter to me

22    from Nintendo about how they have been damaged and the letter

23    from the Entertainment Software Association indicating how the

24    entire industry has been affected by the crimes of Mr. Bowser.  I

25    have the sentencing memorandum of the United States.  I have the

1   defense sentencing memorandum.

2      I have signed a document sealing Defendant's sentencing

3   memorandum, the exhibits, because of them affecting matters of

4   medical privacy and some individual privacy issues of people who

5   were interviewed.  So all of the sealed documents are approved.

6      And I have a letter to me from the defendant accepting

7   responsibility and some letters from people who know him very

8   well and some photographs.

9      So, Mr. Filipovic, do I have everything you wanted me to have

10  in preparation for the sentencing?

11          MR. FILIPOVIC:  Yes, Your Honor.

12          THE COURT:  And have you had an opportunity to go over

13  the reports with your client and make any additions or

14  corrections?

15          MR. FILIPOVIC:  I have, Your Honor.

16          THE COURT:  Mr. Bowser, are you ready to proceed to

17  sentencing?

18          THE DEFENDANT:  Yes, I am, Your Honor.

19          THE COURT:  Okay.  Thank you.

20     We will start with then -- Is it Mr. Patel that is going to

21  do the presentation?

22          MR. PATEL:  Yes.

23          THE COURT:  Yes.

24          MR. PATEL:  Good morning, Your Honor.

25          THE COURT:  Good morning.

1    MR. PATEL:  Before I begin, I would just like to

2    acknowledge a few of the victims in the gallery today.

3         THE COURT:  Oh, great.

4         MR. PATEL:  We have representatives from the

5    Entertainment Software Association and Nintendo of America.

6    At your convenience, Nintendo's General Counsel, Mr. Singh,

7    would like to make a statement.

8         THE COURT:  Absolutely.

9    And the Entertainment Software Association was a plaintiff in

10   front of me -- how many years ago was that? -- 18, 19, when the

11   State of Washington passed a violent video game criminal law that

12   outlawed renting -- made it a crime to rent a video game to

13   anyone under 18 where there was violence committed against a

14   police officer.  And the defendant was Norm Maleng, the King

15   County Prosecuting Attorney, my mentor and great friend.

16   But it was a very interesting proposition.  This is in like

17   2003.  So I got all these video games that I took home, and my

18   boys loved playing.  And, you know, as a judge, you can't help

19   being affected somewhat by your family, right?  So the boys are

20   saying to me, "Dad, if you uphold this law, we will not be able

21   to show our faces in school again," and my wife is like, "If you

22   don't uphold this law, you are not going to get good treatment at

23   home."  So it sort of canceled the two things out.

24   But I did find that it was unconstitutional.  But Paul

25   Smith -- the ESA brought out Paul Smith to argue the case from

 1   Washington, D.C.  Absolutely the best lawyer to ever appear in

 2   front of me.  He did a great job.  But, of course, it was

 3   relatively easy to say, okay, so by "violence against a police

 4   officer," you're meaning you can't have anything that has Robin

 5   Hood in it, right -- because the Sheriff of Nottingham is his

 6   victim -- or *Minority Report?*  Which was a hot movie at the time,

 7   with the thought police who were tracking down people who are

 8   going to commit crimes.  And so I struck it down, and it was

 9   upheld by the Ninth Circuit.

10        So I just put that on there because I haven't been in court

11   for so long and I have all of these stories pent up in me.

12        Go ahead.

13           MR. PATEL:  Thank you, Your Honor.  It's been a while

14   for a lot of us.

15        Gary Bowser was the public face of a sophisticated criminal

16   conspiracy called "Team Xecuter."  The group discovered

17   vulnerabilities in video game consoles, like the Nintendo Switch;

18   they designed hardware and software to exploit those flaws; they

19   manufactured consumer-grade devices that implemented those

20   workarounds; they marketed those circumvention devices around the

21   world using multiple platforms; and they sold the devices to tens

22   of thousands of customers using several distributors and directly

23   through their website.

24        Mr. Bowser was a significant part of Team Xecuter's

25   operations.  He was a spokesman.  He teased and revealed the

1    group's products; he flaunted Nintendo enforcement efforts; he

2    engaged with customers and troubleshooted their problems; and he

3    controlled access to 13,000 copyrighted illegal video games.  In

4    exchange for that, he profited to the tune of $320,000 over the

5    course of seven years until his arrest.  He should be held

6    accountable for those actions.

7         The facts and the guidelines are not in dispute.  As Your

8    Honor noted, a lot of the paper has gone over most of the salient

9    details, so I won't reiterate a lot of that, but there are three

10   points I would like to touch on today.

11        First is the need for and the benefit of strong deterrence in

12   this case, second is the significant role that Mr. Bowser played

13   in the day-to-day operations of Team Xecuter, and third is that

14   the stipulated loss amount is the correct sentencing -- correct

15   measure to use for sentencing.

16        So the first of those, deterrence.  The PSR discusses some of

17   the reservations that the probation office has had in terms of

18   Mr. Bowser's recidivism, and the government echos those concerns.

19   In particular, the situation in which Mr. Bowser finds himself

20   after his release will be very similar to the one when he

21   initially was introduced to Team Xecuter.  He will be socially

22   isolated and financially destitute.  We need to ensure that any

23   sort of sentence imposed today will prevent him from making the

24   same mistakes he did back then.

25        But broader than that, this case provides an example for

1    general deterrence as well.  There's extensive and continuing

2    coverage of this case in the media, both from indictment until

3    today.  Even in the past week, there's been coverage of the

4    parties' sentencing memoranda.  That broad dissemination of this

5    case and its events, coupled with the need to deter current

6    members of the Team Xecuter conspiracy, who we know continue to

7    operate in the space, counsels for a lengthy sentence, and we

8    also need to deter international actors who target U.S. companies

9    and interests from doing that sort of activity.

10       Now, as I'm sure you know, it's difficult and, therefore,

11   rare that we have a foreign actor, a foreign cybercriminal, that

12   we have identified, extradited, and brought to justice before a

13   U.S. court, and because of that, this case gives the court an

14   opportunity to provide a strong message to people following

15   Mr. Bowser's footsteps.

16       Second, Mr. Bowser did not play a limited role in the

17   organization.  He voluntarily and knowingly joined the group,

18   which harnessed his technical knowledge and experience in the

19   video game industry.  He dedicated many hours each day to the

20   enterprise, including writing press releases for his websites,

21   soliciting advertisers, identifying distributors, marketing

22   products, engaging with customers on troubleshooting their issues

23   with the products, and the list goes on.  This wasn't a situation

24   where the enterprise was leeching off of Mr. Bowser's goodwill.

25   This was a symbiotic relationship where both sides were

1   profiting.  Mr. Bowser sold his expertise, his knowledge, and his

2   time for a stipend and the opportunity to get additional money,

3   and Mr. Bowser did just that.  Through the ad revenues he

4   generated from monetizing the criminal assets, the criminal

5   digital assets, he was able to gain around $33,000 each year over

6   the course of his seven years.  That was his personal initiative

7   and personal gain.

8       Third, Mr. Bowser's gain is not the appropriate measure to

9   use for sentencing, because his actions in administering the

10  company's website, marketing its products, engaging with

11  customers, and identifying distributors all were in furtherance

12  of the conspiracy, which gained tens of millions of dollars.

13  Mr. Bowser was an integral part of the scheme and had many years

14  of experience in the industry, giving him an edge and some

15  insight.

16      While he might have been an unlucky businessman, that doesn't

17  condone his actions here.  The stipulated loss amount was the

18  foreseeable result of the enterprise's and Mr. Bowser's conduct.

19  But even if you do look at Mr. Bowser's gain, the $320,000 over

20  the course of seven years, it did provide a very comfortable

21  lifestyle.  That equates to about $3,800 a month, all of which

22  was disposal income that would not have been available to him but

23  for his involvement in the conspiracy.  And you have to keep in

24  mind that this was in the Dominican Republic, where the lifestyle

25  is a little bit different than some of the other co-defendants in

1  the case.  That amount allowed Mr. Bowser to live a comfortable

2  life.  He bought a car, he was living in a nice apartment, after

3  basically losing everything.

4      Your Honor, Mr. Bowser was the public face of Team Xecuter.

5  He should be held responsible for his actions that enabled the

6  conspiracy to thrive.  For that, the government asks for an

7  imprisonment of 60 months, three years supervised release, and a

8  portion of restitution of $4.5 million.

9          THE COURT:  Great.  Thank you very much.

10      Would you like me to hear from Mr. Singh now?

11          MR. PATEL:  At the court's convenience.

12          THE COURT:  Sure.  Yeah, let's do that.

13      For the record, could you just say your name and spell your

14  first name and last name?

15          MR. SINGH:  Sure.  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MR. SINGH:  My name is Ajay Singh.  A-j-a-y.  Last name,

18  Singh.  S-i-n-g-h.

19          THE COURT:  Thank you, Mr. Singh.  Go right ahead.

20          MR. SINGH:  Thank you, Your Honor.

21      I have been with Nintendo for more than ten years now.  I

22  currently serve as General Counsel and as the Vice President of

23  Business Affairs.

24      Nintendo has incurred great harm and financial loss for many

25  years from Defendant's unlawful conduct.  We appreciate the

1  opportunity to share our views here today.

2     I, of course, do not want to restate everything in Nintendo's

3  Victim Impact Statement, which the court already has and has

4  reviewed, but I do want to take a chance to share how

5  Defendant's conduct and that of his co-conspirators has deeply

6  affected Nintendo of America and what we do, as well as the

7  community we serve.

8     We also believe this is a unique opportunity for the court --

9  sorry, for the unlawful hacking community and for the gaming

10  community as a whole to understand that IP crimes cause real

11  harms and are serious offenses.

12     I would like to start with a few words on who we are.  Of

13  course, at its most basic level, we market and distribute

14  electronic video games, consoles, and accessories.  But we are

15  also part of the community.  We have been headquartered in this

16  district for decades, and Nintendo has been a stable company, a

17  job creator in the Seattle area, currently employing over 1,200

18  people in this area.  Our mission at Nintendo of America is

19  simple and has been the same for decades:  to create smiles

20  through unique entertainment experiences.  This mission begins

21  with our customers, continues with our consoles, and includes our

22  games.

23     Nintendo released its first video game console in the United

24  States in 1985 and has continued to innovate in the video-game

25  space ever since.  For decades, our customers have turned to

1   Nintendo and our games not only for entertainment but to stay

2   connected and have fun with their friends and with their family,

3   including during the pandemic.  Community is at the heart of what

4   we do.

5       Nintendo also plays an important role in the broader gaming

6   community.  We partner with thousands of third-party game

7   developers around the world who rely on Nintendo platforms to

8   promote and monetize their games and so they can also continue to

9   innovate.

10      In March 2017, we released the Nintendo Switch, a home video

11  game console, which can be played not only connected to the

12  television but also on the go.  And over the past five years,

13  the Nintendo Switch, and various variations of it, have become

14  one of the most -- sorry, one of the best-selling video game

15  consoles of all time, having sold now more than 100 million units

16  worldwide.

17      Nintendo itself, of course, makes video games for the Switch,

18  and most of those are played by millions of players, but as I

19  noted, we partner with thousands of third-party game publishers

20  who make games, and, together, the hardware is the center of an

21  ecosystem of developers and players who sustain each other in a

22  virtuous cycle.

23      Like other video game consoles, the Nintendo Switch contains

24  numerous technological measures to protect the ecosystem.  These

25  security measures are critical in preventing someone from

1    breaking into the system to copy and distribute our games, as

2    well as our third-party partners.

3        It's the purchase of video games that sustains Nintendo and

4    the Nintendo ecosystem, and it is the games that make the people

5    smile.  It's for that reason that we do all we can to prevent

6    games on Nintendo systems from being stolen.  We do this by

7    creating technological protection measures which can be thought

8    of as a good old-fashioned lock.  And the Team Xecuter software

9    distributed by defendant and his co-conspirators is the

10   black-market skeleton key to that lock.  Once the key is used,

11   the lock is open, and the software can be used for unauthorized

12   copying, playing, and modifying of pirated games.

13       Defendant, for years, trafficked in that skeleton key,

14   meaning he marketed and sold, for money, various tools used to

15   copy, distribute, and play pirated games.  Defendant has admitted

16   that the primary purpose of those tools and their hacking efforts

17   was to promote piracy, and, indeed, the tool's only purpose was

18   breaking into our consoles to allow the playing of pirated games

19   and the running of associated software.

20       To briefly illustrate this point, I would like to provide a

21   couple of examples of the tools distributed by Defendant and his

22   co-conspirators.  One is called "SX Dumper," which is a feature

23   that does only one thing.  It permits a user to dump, i.e.,

24   unlawfully copy, the contents of an authentic Nintendo game.

25   Defendant, in fact, posted to the enterprise's web page

1  screenshots of this tool being used to illegally copy titles

2  owned by Nintendo.

3      Defendant and his co-conspirators also distributed a tool

4  called "SX Installer," which connects the user to a menu of

5  installable, pirated games.  And the tool was described by

6  Defendant, again, on posts on the enterprise's web page, as being

7  able to delete one of Nintendo's technological measures.

8      The third feature I will highlight is what the defendant and

9  his co-conspirators call "stealth mode," which is designed to

10  make it more difficult for Nintendo to identify the users playing

11  pirated game copies.

12      Turning more specifically to Defendant, he played a

13  significant and direct role in the success of Team Xecuter, and

14  he held a leadership position.  For over a decade, Defendant

15  served as the equivalent of a chief marketing officer, as well as

16  the chief operating officer of the enterprise, and has been one

17  of only a handful of key members of Team Xecuter running the

18  day-to-day operations of the piracy group.  He operated the

19  enterprise's various web pages, which were the hub of the

20  enterprise, and these sites routinely connected customers to

21  resellers from around the world where they could obtain the

22  hacking devices and which contained updated information, updated

23  download files, license, keys, anything needed to run the hacking

24  software.  He also helped to ensure that there was ongoing

25  customer support of, basically, every feature and every tool

1    circulated by this organization.

2         More broadly, Defendant was one of three to five people on

3    the leadership team and the right-hand man for Max Louarn, who

4    was thought of as the person at the top of this organization.

5    Defendant corresponded with Mr. Louarn constantly and was the

6    main contact as well for Team Xecuter's distribution and

7    manufacturing centers abroad.  In total, between June 2018 and

8    Defendant's arrest in September 2020, Defendant trafficked in

9    hundreds and hundreds of thousands of circumvention devices.

10        Turning to the harm caused by these actions and by Defendant,

11   I will start with some of the financial harm, which is

12   substantial, not only to Nintendo, but also to our partners and

13   licensees.

14        With respect to Nintendo, the defendant and the government

15   have stipulated to damages greater than $65 million.  On top of

16   that, Nintendo has spent enormous resources trying to stop Team

17   Xecuter.  We have been working on this for decades -- well, at

18   least for a decade, I would say.  Nintendo has had to update its

19   hardware to prevent Team Xecuter devices from working.  That

20   included releasing a new version of our console.  It has also

21   spent significant resources on software updates and, of course,

22   on IP enforcement around the world.

23        Team Xecuter also causes significant harm to Nintendo's game

24   publisher licensees and partners.  Many game publishers are small

25   studios that invest substantial amounts of capital and work hours

1  in developing just one or two games for release every few years.

2  The costs for developing interactive games are high, often

3  millions of dollars.  That's an enormous investment for these

4  companies and for the individuals associated with those

5  companies, and their margins are sometimes incredibly small.

6      In fact, Your Honor, as noted earlier, Michael Lewis, from

7  the Entertainment Software Association, traveled here today

8  because of these very concerns.  ESA represents those third-party

9  licensees, and its presence here emphasizes that rampant piracy,

10  which is Team Xecuter's goal and their profit driver, jeopardizes

11  those publishers' entire businesses.  Team Xecuter takes money

12  that, fairly, should go to the game developers, and that's not

13  sustainable.

14      I would also like to address some of the nonfinancial harms,

15  one of which is cheating.  The SX OS distributed by defendant and

16  his co-conspirators allows cheating in games in Nintendo's

17  system, which jeopardizes the community that Nintendo strives to

18  create.  When cheats are introduced onto our multiplayer

19  platforms, it ruins the experience for everyone else, for the

20  benefit of one individual who happens to be cheating.  That

21  includes the families and children who are at the heart of our

22  customer base.  People get frustrated with cheating, and, of

23  course, frustrated people stop playing the games or returning to

24  the community.  Parents should not be forced to explain to their

25  children why people cheat and why sometimes games are not fair

1    just because one person wants an unfair advantage.

2        Just as concerning, SX OS also allows users to modify their

3    characters' online game-play to include nonnative content,

4    including, potentially, inappropriate content.  This is not a

5    small issue, as it threatens the community and the entertainment

6    value Nintendo provides.  And we have taken many steps and

7    employed a number of people -- many people -- to keep our games

8    secure from that type of content.

9        Finally, Nintendo has had to release a new version of our

10   hardware in response to one of these hacking tools, and this

11   modification entailed countless hours of engineering and

12   adjustments to our global manufacturing and distribution chains

13   and, of course, corresponding resources.  To be clear, these

14   effects are a direct result of the defendant and Team Xecuter

15   attacking our technological protection measures.

16       Finally, I just wanted to conclude by talking a little about

17   our concerns relating not only to Defendant specifically, but

18   also to others within Team Xecuter who are closely watching and

19   who are already seeking their next endeavor to attack our

20   systems.

21       I would like to start with concerns about what Defendant does

22   next.  To be clear, Defendant has worked with us to resolve the

23   civil case we filed against him.  We found him to be forthcoming

24   in that process.  We have sincere hope Defendant will live a

25   law-abiding life following his release, but Nintendo remains

 1   concerned that Defendant is at high risk of reoffending.  He was

 2   first arrested in connection with Nintendo piracy in 2008, and he

 3   then spent 12 years undermining our console security and

 4   infringing our games.  That kind of dedication is not easily

 5   eroded.

 6        Also, Defendant is not a U.S. citizen, and we understand he

 7   will likely be deported following the conclusion of his sentence

 8   here.  We fear there is no way to effectively ensure compliance

 9   and change behavior once his sentence concludes.

10        We also have significant concerns about Team Xecuter and the

11   hacking community as well in relation to what happens here today.

12   First, Team Xecuter has gone to great lengths to try to avoid

13   prosecution and detection overall.  For example, Defendant and

14   the other Team Xecuter members specifically targeted the United

15   States market, all the while deliberately avoiding travel to the

16   United States, avoiding storing assets in the United States or

17   directly conducting operations in the United States.  Similarly,

18   Team Xecuter and its resellers routinely move their servers to a

19   new country or create new domains when Nintendo shuts down an

20   illegal website.

21        Second, the community is watching.  The hacking community and

22   much of the wider gaming community is watching the outcome of

23   this case very closely, and Team Xecuter leaders have actively

24   monitored Nintendo litigation in the past, going so far as to set

25   up Pacer accounts under fake names to pull our filings.

1    And perhaps most critically, the enterprise is continuing

2    even while Defendant is behind bars, because most of the

3    enterprise is not currently behind bars.  After the Department of

4    Justice seized -- I'm sorry.  After the Department of Justice

5    seized the Team Xecuter domains, one Team Xecuter admin noted

6    that the developers of Team Xecuter devices are still doing fine,

7    although they're in hiding.

8        We know that this criminal case has dissuaded some members,

9    but it has not dissuaded all of them, and the next steps will be

10   impacted by the sentence the court imposes here.

11       Last, I will just say thank you, Your Honor, for allowing us

12   to speak today.  This is a very significant moment for us.  We

13   have been working towards this moment for more than ten years,

14   multiple teams across the globe.  We appreciate your time and

15   that you would consider our views.

16       THE COURT:  Thank you, Mr. Singh.

17       You probably have come across this.  Sometimes in TV or

18   motion pictures, hackers or pirates are sort of glorified as

19   they're sticking it to the man, and big companies are reaping

20   tremendous profits and it's good for the little guy to have this.

21       You've addressed the fact that Nintendo employs 1,200 people

22   in the Seattle area, that there are smaller developers whose

23   profit margins are very narrow.

24       What do you think?  What else can we do to convince people

25   that there's no glory in this hacking/piracy?

1          MR. SINGH:  That's a very complex question, Your Honor.

2      I think a large -- there would be a large benefit to further

3  education of the public and of, particularly, individuals who are

4  interested in the excitement of perhaps doing something that was

5  in this area.  I think we have seen some success in the Motion

6  Picture Association and in the music arena in that regard.  And I

7  think there could be a little bit of additional work done there

8  that would benefit the ecosystem in general.

9          THE COURT:  Great.  Well, thanks so much for coming in.

10  And I really appreciate your very thoughtful letter and the

11  remarks you've made today.

12          MR. SINGH:  Thank you, Your Honor.  We appreciate your

13  time.

14          THE COURT:  Great.

15      Mr. Patel, is there anyone else who wants to address the

16  court, from the prosecution?

17          MR. PATEL:  No, Your Honor.

18          THE COURT:  Okay.  Thank you very much.

19      Mr. Filipovic.

20          MR. FILIPOVIC:  Thank you, Your Honor.

21      Your Honor, the first thing I would like to say is that, you

22  know, it's really been my pleasure to represent Mr. Bowser.  He's

23  been one of the most honest and straightforward and direct

24  clients that I've represented in the many years of my practice.

25      When the government provided us this information about what

1   the loss amounts were for Nintendo and the damage to Nintendo,

2   that you heard Mr. Singh speak about, and to others, I met with

3   Mr. Bowser, and I just assumed they were exaggerating, that it

4   couldn't be that much money, it couldn't be that much damage, and

5   he looked at me and said, "Yep, yep, yep, that's all true."  And

6   it really speaks to his acceptance of responsibility in this

7   case, you know, both by his words and the actions he has taken

8   over the last 16 months.  So there's not -- particularly with

9   Mr. Patel's remarks, there's not much I can really disagree with.

10      With respect to Mr. Bowser's role in this case, I would

11  direct the court to the carefully crafted statement of facts in

12  our plea agreement and to the presentence report.

13      One of the things that has happened over time is that facts

14  get embellished when we're talking about what the group did and

15  what Mr. Bowser's role was, and I think it's important to keep

16  those two things separate.  Without Mr. Bowser, this enterprise

17  would have gone on.  There would have been another Mr. Bowser.

18  Without Mr. Chen, without Mr. Louarn, that's not true.

19      Mr. Bowser was not a developer.  The developers, the people

20  who actually made these devices and fixed them when Nintendo

21  responded to it, they were paid very handsomely, much more than

22  Mr. Bowser.  He was not a reseller.  He was not one of those

23  independent contractors who was making a lot of money for that.

24  That being said, the comments about Mr. Bowser's role as being

25  significant are accurate, and we're not disputing that.

1      What I would like to focus on with my remarks is what really

2   seems to be the main emphasis here, both from the government and

3   from Nintendo, which is the concept of deterrence.  And the court

4   is well aware that there's two aspects to deterrence.  There's,

5   you know, deterring Mr. Bowser from going forth and committing

6   future crimes, and then there's the general deterrence, all the

7   people that are listening to this hearing, all the people that

8   are going to be paying attention to what the court's sentence is.

9      I would first like to speak about specific deterrence, and

10  the court has a letter from Mr. Bowser.  He's also going to speak

11  to the court.  I know that Your Honor has been on the bench a

12  long time, and there's probably a certain skepticism when you

13  hear from someone that says, "You're never going to see me again,

14  Your Honor.  I will never be in trouble again."

15      THE COURT:  Sometimes I write down the year that I'm

16  going to see them again, yeah.

17      MR. FILIPOVIC:  But in Mr. Bowser's case, I don't think

18  it will be a year and I don't think you will be writing down a

19  year.  There's, basically, a number of reasons why I think

20  specific deterrence should not even be taken into account here

21  because, Mr. Bowser, there are many reasons why he's not going to

22  do this again.  One is the metamorphosis he's made while at the

23  detention center, the statements he's made, the work he's done in

24  this case.

25      The other thing is that if you look at Mr. Bowser and you

1    look at what he has been through -- and I think this relates to

2    the deterrence issue -- I have just brought three photographs

3    that I would like the court to see, and I'm sure the court maybe

4    has seen these places before, but these are photos of where he's

5    been living the last 14 months in the Federal Detention Center.

6        Now, the photo that I have up here, this is not his unit,

7    this is another unit, but they're all the same.  I have been in

8    every one of these units at the FDC.  This is the general area.

9    So when things are good, this is where the prisoners can go

10   during the day for a few hours.  There's actually something

11   that's not shown here.  There's a little gym area, there's a

12   library.  But this is where he's been living for 14 months.

13       For six of those months, he's been on a form of a lockdown

14   due to COVID or some other reasons.  And this is a picture of how

15   you get into a cell like Mr. Bowser's.  That's the entryway to

16   each of these cells.

17       This is a picture of a typical cell at the detention center

18   at SeaTac.  Two people live in this space.  I showed this to

19   Mr. Bowser this morning -- because this is not his cell -- and he

20   said, "Well, you know, I'm in a somewhat special cell.  Mine is

21   about 18-inches wider because it's a special cell to accommodate

22   the wheelchair that I was using much of the time, and I get the

23   bottom bunk because of my problem."  But there are two people

24   here.

25       For six months of the last 16 months, he has been locked in

1   this sized cell, plus 18 inches, for at least 23 hours a day.

2   During the height of COVID, they only let people out every three

3   days to go out to take a shower for maybe a half an hour and come

4   back.  So, you know, he gets out a little bit, but this is where

5   he spent six months.

6       The reason I'm showing this to you is not to ask the court to

7   feel sorry for Mr. Bowser or to say that his conditions are maybe

8   any different from any other of my clients or our office's

9   clients that have had to suffer through this time, but to make

10   the point that if this doesn't deter someone like Mr. Bowser, you

11   know, will another six months, will another year, will another

12   two years, is that what is necessary, to convince someone to not

13   get back into this business and face this kind of a, you know,

14   problem and these types of confinements?

15       The other thing I would like to address with respect to

16   specific deterrence, you know, probation -- I agree with the

17   court.  I thought the probation officer's report was

18   exceptionally well done.  In fact, the statement of facts and the

19   history of my client was so well done that I didn't spend a lot

20   of time on that in my sentencing memorandum.  Where I disagree

21   with probation, with the government, and with Mr. Singh is the

22   issue of specific deterrence.  And one of the things that was

23   mentioned in one of the reports, either in the government's or

24   probation's, was that because he's a Canadian citizen, he's going

25   to have to be sent back to Canada and we can put him on

1  supervised release but we can't supervise him, so in order to

2  make sure we deter Mr. Singh -- not Mr. Singh -- I mean,

3  Mr. Bowser, then we really should be giving a longer period of

4  imprisonment for purposes of specific deterrence.

5      I strongly disagree with that for several reasons.  One, that

6  is not specific deterrence.  Number one, that is incapacitation.

7  That's an argument for putting -- incapacitating someone so they

8  won't commit other crime.  And the court is familiar with that.

9  I mean, there are many cases where someone commits a violent

10  crime or they're a serious physical risk to the community, like a

11  drug lord, you know, defendants like that, where part of the

12  sentencing analysis is:  How long do I need to keep this person

13  locked up just to keep him away from other people and keep people

14  safe?  That's not Mr. Bowser.

15      The second reason I think that's an inappropriate factor for

16  the court to consider here is, in my papers, I pointed out all

17  the differences that Mr. Bowser has faced and will continue to

18  face as a non-U.S. citizen with whatever court -- with whatever

19  sentence the court imposes.  His sentence will likely -- he will

20  serve, behind bars, twice as much as a U.S. citizen would serve

21  if given the same number on the sentence.  And to now, in

22  addition to that, say we have to give him even more time because

23  he's a Canada citizen or he's not a U.S. citizen, because we

24  can't adequately supervise him on supervised release, is really

25  like a triple whammy.  He gets worse custody conditions, he gets

1   longer time behind bars, and now he gets a longer sentence

2   because of something he can't control.  And I would urge the

3   court not to consider that in the analysis.

4        And in that vein, with respect -- well, this more goes to

5   general deterrence, and that has to do -- I'm going to talk about

6   general deterrence next.  You know, the concept of general

7   deterrence, and the reading I've done on it, is that it's not

8   really the length of an individual's sentence that really fosters

9   general deterrence; it's certainty of apprehension, arrest,

10  conviction.  The length of the sentence really does not have that

11  great of an impact on general deterrence.  And I agree with what

12  Mr. Singh and what Mr. Patel said, that this case will have some

13  attention and the online-community people will read about it,

14  but the way to deter people is to arrest more people, charge more

15  people, take more civil actions against people.  I know the

16  government, and I know Nintendo in particular, are really focused

17  on that and they're making strong efforts in that regard.  But

18  the court should not be used as a vehicle to send a message, so

19  to speak, to others through one person by imposing an unduly

20  harsh sentence simply for the purpose of sending a message to

21  others.  First, I don't think it's empirically supported, and,

22  again, I don't think that's a fair way to treat Mr. Bowser in

23  particular, who, again, is the, you know, third defendant in this

24  three-defendant case and the least culpable of the three people

25  involved and the one that was the most dispensable and the least

1  compensated.

2      And, you know, one of the things that was mentioned also was

3  Mr. Max Louarn, who's like -- he's the lead guy.  I point out in

4  my papers he has a federal conviction from the '90s.  I think he

5  served 60 or 70 or 80 months on that case.  It was like a phone

6  card scam of some sort.  Based on my research through a paralegal

7  in the office, it appears he has a pending extradition matter in

8  France.  We have not been able to obtain the documents from that.

9  The information I was provided yesterday was he may have a

10  hearing sometime in May.

11      I think one of the problems that the government has had with

12  these cases is getting some foreign countries to extradite.  You

13  know, Canada is not one of those countries.  I don't know about

14  France and their history with these types of cases.  That action,

15  I assume, is still going on, and there's the possibility that

16  they will extradite him at some point.  But in addition to the

17  people online looking at this, I think the courts in France will

18  be looking at this, and they will be saying:  Okay.  Should we

19  extradite this person?  How will that person be treated in a

20  courtroom in the United States if they're sent over to the United

21  States?

22      I think there's another aspect to this.  That if the court

23  imposes too harsh of a punishment or for the wrong reasons, it

24  could send the wrong message to some of the foreign governments

25  that are being asked to cooperate with the entertainment industry

1    and with Nintendo and other industries, and I think that should

2    also be taken into account.

3         Your Honor, when I met with Mr. Bowser, when Mr. Sanders and

4    I met with Mr. Bowser this morning in the lockup -- it's really

5    interesting how you learn new things all the time, even after you

6    have been with someone for a year -- and we were just discussing

7    the journey he took when he arrived in New Jersey, was taken into

8    custody, and then went from one federal prison to another and

9    ended up in Nevada.  And he told me when he came in, he weighed

10   410 pounds -- I didn't know that he weighed that much -- and by

11   the time he got to the FDC, he was down to 320.  He had lost

12   90 pounds.  So I asked him, "Well, how did that happen?"  Well,

13   he said he wasn't getting adequate treatment for the

14   elephantiasis in his leg.  And the one thing you have to really

15   worry about is you have to worry about skin breakage, and when

16   that happens, you're very susceptible to a bad infection.  He had

17   a bad infection, they took him to a hospital in Pahrump, Nevada,

18   and he got past that.  But, you know, I asked him how he was

19   doing this morning.  He says, "Well, you know, I had this little

20   break in my skin this morning."  I said, "Well, how are you

21   dealing with that?"  He said, "Well, I had some coffee and I made

22   a little paste, and I've heard that that's really good to take

23   care of your skin."  And I think it just brought home for me that

24   the physical challenges he has -- they're not life threatening;

25   you know, the BOP will try to do the best they can to take care

1  of him -- it is a big challenge to get adequate medical care, and

2  he has to essentially care for himself.

3       Mr. Bowser is not a person who feels sorry for himself.  You

4  know, it's a sad story when you look at his whole life.  I mean,

5  he's had some successes, he grew up in a good family, good

6  parents, then had some tragedy strike.  But he's always been a

7  person who has looked to the future, which is what he's doing

8  right now.  He's looking forward to getting out, he's looking

9  forward and actually eager to continue in the work he has done

10  for himself and for others when he's been in custody.  He's

11  committed to that, and I believe that he will follow through on

12  all of those commitments.

13       So, Your Honor, we would respectfully ask that the court

14  impose a sentence of 19 months.  That is, effectively, a

15  time-served sentence.  I think he would be released in a few days

16  or weeks, if the court imposed 19 months.  It is also,

17  effectively, the same as a 38-month sentence, 38 months of a

18  time-behind-bars sentence for a U.S. citizen.  We ask the court

19  that -- we suggest to the court that balancing all of the factors

20  here, that that is the fair result here.

21            THE COURT:  Thank you, Mr. Filipovic.

22       When are you actually stepping down?

23            MR. FILIPOVIC:  Well, Your Honor, March 1st is when

24  Mr. Fieman takes over.  My last day working, before I go on

25  leave, is next Tuesday.

1          THE COURT:  So this may be your last time appearing in

2   front of Judge Lasnik?

3          MR. FILIPOVIC:  Yes, Your Honor.

4          THE COURT:  Well, I just want to say it's been an

5   absolute joy to have you always prepared, always articulate,

6   always respectful, and we will miss you very much in the federal

7   criminal justice system, and we're very grateful for all the work

8   you did.

9       I was telling my extern that before she was born, you and I

10   argued a case in the State Supreme Court and we have known each

11   other quite a long time and the mutual respect is apparent.

12       So thank you very much, Mr. Filipovic.

13          MR. FILIPOVIC:  Thank you, Your Honor.

14          THE COURT:  Sure.

15       So Mr. Bowser will address the court now?

16          MR. FILIPOVIC:  Yes, Your Honor.

17          THE COURT:  He can do it from there or he can do

18   it from -- whichever way he wants.

19          MR. FILIPOVIC:  He would like to go to the podium.

20          THE COURT:  That's fine.  You can go to the podium.

21          THE DEFENDANT:  Good afternoon, Your Honor.

22          THE COURT:  Good morning, Mr. Bowser.

23          THE DEFENDANT:  I would like, of course, to say a few

24   words to the court --

25          THE COURT:  Yes.

1        THE DEFENDANT:  -- and accept my full responsibility for

2    the crimes I committed against Nintendo and all that are victims

3    in this case.  There are thousands of video game publishers that

4    were hurt by my actions.  And I am sorry for the damage I have

5    caused.

6        I have written a few letters and I have submitted them to the

7    court in advance, but I had been thinking last night what to say

8    now, but I really don't have a prepared speech, so I'm just going

9    to talk.

10        THE COURT:  Uh-huh.

11        THE DEFENDANT:  It has been a very traumatic experience

12    for me getting arrested, coming here, going through this.  This

13    is my first time actually in a jail going through the court

14    process and everything.  And the amount of time I've spent

15    already, 16 months in custody, a lot of that time -- I spent six

16    months, basically, locked up due to COVID.  I went through all

17    three of the COVID waves before there was even a vaccine

18    available.  I personally haven't got the vaccine, and the reason,

19    I am skeptical with my medical condition, how it will affect me,

20    and I haven't been able to actually have proper medical treatment

21    because I haven't been able to have a one-on-one with a doctor to

22    see if the vaccine would be possible with my health conditions.

23        When I first got arrested, I was 410 pounds.  I had to use a

24    wheelchair.  I spent my life drinking, since I was age 15, after

25    my mom died, and this is the longest time I have been sober in my

1   life.

2        And during my lockdown, I have spent a lot of time alone,

3   thinking, reviewing my life, my choices, the mistakes I've made,

4   and I'm ready to make amends for everything I've done.  And I am

5   completely sorry for the damage I have caused.

6        To Nintendo's estimates, the 72 million is a small fraction.

7   They've probably lost billions due to piracy.  And it's an

8   ongoing problem.  And my part of the conspiracy was really

9   insignificant compared to what others have done.  I have seen it.

10  I have reported on it over the news.  My main part of the role

11  really was on the news part, so I followed both sides, the good

12  and the bad and the ugly parts of it.  And I know a lot of

13  developers personally that have been affected by it.  I was

14  actually sorry that I played a part in causing that.

15       And as Nintendo mentioned in their statement, there really

16  needs to be a deterrent to stop others, but as my lawyer also

17  mentioned, prison time really is not going to stop others.

18  There's so much money to be made from piracy that it's

19  insignificant.  People would rather commit the crime and have

20  tons of stuff.  I myself am not a greedy person.  I just want to

21  live, make enough to support myself.  I'm not like others.  I

22  know developers that have bought like seven BMWs, have bought

23  houses with the money they've made; resellers that take vacations

24  every year to countries.  I have lived in the same place for over

25  ten years.  I only -- any money I make, I use to help others.  I

1    find giving back to the community better.  And I'm sorry that I
2    made money from an illegal operation, and it was a mistake to do
3    so.
4        In the past, I would -- I wasn't doing that.  When I was a
5    younger person, I was very successful business-wise.  I made my
6    money legit, and I helped raise kids.  I had beautiful
7    relationships, some problems in my life.  But my main focus now,
8    after I get released, is to better myself.  I have already taken
9    those steps while in custody.  I have lost weight, I have been
10   exercising, I haven't been drinking, of course, and I feel
11   better.
12       And the time I have spent alone in my cell, I've done a lot
13   of reading.  I've had a few cellies that have also had
14   psychological problems, so I get their books and I go through it
15   and realize, wait a minute, I might have some problems I need
16   some help with.  And when I get out, I'm going to seek
17   professional help for my drinking and I'm going to continue
18   bettering myself.  And I no longer have high blood pressure
19   because I have lost weight.  So that's one step.  And even though
20   my leg is actually a lot better than it was when I first got
21   arrested, I think it will get better once I get proper medical
22   treatment.
23       And as for my future plans, there is deterrence.  They're
24   talking about I'm going to recommit, I'm going to do this again
25   the moment I get out.  Well, there's three major reasons why not.

1   Number one, I have been arrested.  I went through all of this

2   traumatic process, and I am sorry for my actions, and I am

3   clearly not going to do this again.  Number two, even if I wanted

4   to, I really couldn't, because the video game world, like

5   Nintendo mentioned, is monitoring everything, watching it.  I am

6   basically excessed from that society, and I don't want to have

7   any party of that anymore anyway.

8       So I'm going to go back, when I get released, back to my

9   original passion in life that made me successful.  I was very

10  good at programming home computers and designing software.  I

11  myself was a small-time publisher.  So I want to go back to doing

12  good stuff in that way.  But that doesn't make money right away.

13      I have also been looking, while I was in jail, at various

14  courses that I could take and things I can do.  Unfortunately,

15  where I'm housed right now, and due to COVID, there is no

16  programming.  I can't take any programs or anything.  But there

17  was one course that I looked at, which was really good -- and I

18  have already ordered it; it cost $49 -- and it was to learn how

19  to be a freight broker.  And, right now, that's very

20  valuable/needed, because of the supply-chain crisis.  That

21  actually helps distributors and publishers too.  And it's

22  something I can do, with my limited mobility, from any location.

23  And I have already talked to the representative of -- it's a

24  program offered from The Golden Phoenix Project, it's called

25  "Fresh Start Lifestyles," and they have been in touch with some

1  of my people that have written character reference letters.  And

2  it's only going to cost $1,000 for the complete course, once I'm

3  out.  And they will supply me with a laptop and all the licenses

4  and all the forms and a mentor and the leadership skills to

5  become a freight broker, a licensed freight broker, and I can

6  operate that business from both the U.S. and Canada.  And they

7  estimate I will be making 44,000 to 90,000 a year right away,

8  once I start.  So that is one of the things I will focus on.  And

9  that will keep me away from possibly recommitting crimes or

10  anything else, and this experience I have gone through already

11  will definitely do so.

12     That's really all I have.  And, Your Honor, if you have any

13  questions, you are free to ask me.

14          THE COURT:  Well, the question I asked Mr. Singh about,

15  you know, sort of the glamour of hacking.

16          THE DEFENDANT:  The glamour, yes, that is definitely out

17  there.

18          THE COURT:  Yes.

19          THE DEFENDANT:  Unfortunately, Hollywood glamourizes

20  hackers and stuff.  What is really needed is education.  There

21  needs to be more education about that it really -- how people are

22  hurt.  People don't realize how much it actually hurts people.

23  There needs to be more education.

24          THE COURT:  Aren't you kind of in a unique position to

25  make that point?  I mean, you are, obviously, a writer.

1     THE DEFENDANT:  Yeah.  One of my cellies actually said I

2  should write a book about it or something.

3     THE COURT:  Yeah.

4     THE DEFENDANT:  Yeah.

5     THE COURT:  Or at least an article that the industry

6  might publish to say --

7     THE DEFENDANT:  Yeah.

8     THE COURT:  -- I was wrong to do what I did because I,

9  you know, was hurting little people, not just big companies.

10    THE DEFENDANT:  Yeah, that's right.  You hurt a lot of

11 little people.

12    THE COURT:  Yeah.  So would you do that?

13    THE DEFENDANT:  Yeah.  I would be open to actually

14 helping educate.

15    THE COURT:  Okay.  Great.  Thank you.  All right,

16 Mr. Bowser.  Thanks very much.

17    THE DEFENDANT:  Okay.  Thank you, Your Honor.

18    THE COURT:  This has been scored as an Offense Level 31,

19 Criminal History Category 1, and the guideline range is nine to

20 ten years, 108 to 120 months.  Senior Probation Officer Whaley

21 recognizes this is a proper departure downward under very many

22 circumstances, and even the government agrees to that.

23    What is the proper sentence for Mr. Bowser under the

24 circumstances?  And, of course, reasonable minds can differ on

25 that.  I think the government's recommendation of five years is

1    absolutely solid and appropriate in normal times, but we're not

2    in normal times.  We're in a difficult situation health-wise and

3    incapacitation-wise, prison-wise, and we don't know where we're

4    going in the future, but we know in the past it's been

5    considerable hard time.

6        Now, let me address the two aspects of deterrence, and here I

7    agree with Mr. Filipovic strongly on one and disagree strongly on

8    the other.  I'm not worried that Mr. Bowser is going to reoffend.

9    I believe he has turned a corner, I believe he sees the light,

10   and I don't think he will reoffend.

11       On the other hand, general deterrence and sending a message,

12   I always tell the jurors, "Your role is not to send a message.

13   Your role is to decide guilt or innocence on the facts."  But my

14   role sometimes does entail sending a message.  For a long time,

15   you know, white-color crime was considered not real crime and it

16   flourished.  We, in this community, still remember the Washington

17   Mutual Bank disaster where nobody went to prison, nobody went to

18   jail, nobody got criminally prosecuted, for what should have been

19   serious criminal offenses.  And when people do start getting

20   charged with things, it does have an impact and provides general

21   deterrence that this is not a joke, these are serious criminal

22   offenses, with real victims and significant financial impacts on

23   communities.

24       So I think there is a role to be played here in terms of a

25   message being sent out, and I want the message to be clear that,

1    under normal circumstances, I would send Mr. Bowser to prison for

2    five years.  I don't want to send any kind of mixed message to

3    France.  If Mr. Louarn comes in front of me for sentencing, he

4    may very well be doing double-digit years in prison for his role

5    and his involvement, and the same with the other individual.  But

6    we do have a situation here where Mr. Bowser, as terrible as his

7    crimes were, is the least culpable of the three, and he has

8    serious medical issues and challenges, and he's been incarcerated

9    under very difficult conditions for a significant period of time.

10        So taking all of those things into consideration, I'm going

11   to agree with Ms. Whaley here that a 40-month sentence is

12   appropriate, and I will impose the 40 months.

13        Upon finishing that sentence, Mr. Bowser will probably be

14   deported to Canada, but we will place him on three years of

15   supervised release, subject to standard conditions and the

16   following special conditions:  If deported, you shall not reenter

17   the United States without explicit permission of the Department

18   of Homeland Security.  If you get such permission, you should

19   report to the nearest probation office within 72 hours of

20   reentry.  There is restitution in the amount of $4,500,000.  Any

21   unpaid amount should be paid during the period of supervision in

22   monthly installments of not less than 10 percent of your gross

23   monthly household income.  I will waive interest on the

24   restitution.  And you shall submit to search of your person,

25   property, house, residence, storage unit, vehicle, papers,

 1    computers, and all other electronic devices or media, conducted

 2    in a reasonable time and manner by U.S. Probation.  I will waive

 3    a fine for the inability to pay and the large amount of

 4    restitution.  There is a special assessment of $100 on each of

 5    the two counts, which is due immediately.

 6        And just to be clear, the 40 months is on Count 6, and

 7    40 months on Count 9, to run concurrently, for a total of

 8    40 months imprisonment.

 9        There was a waiver of appeal if the court stayed within or

10    below the guidelines, so I'm not going to advise of that.

11        I do appreciate counsel getting together and agreeing this is

12    not a leadership role, but it's not a minimum role either.  So we

13    have an agreed sentencing guideline range and criminal history

14    category here.

15        So, Mr. Werner, is there anything else you need me to say

16    about the restitution or the order?

17            MR. WERNER:  Your Honor, could you confirm that you

18    intend to place Mr. Bowser on three years of supervised release?

19            THE COURT:  Yes, three years of supervised release.

20    Yes.

21            MR. WERNER:  Nothing further.

22        I will check with Mr. Filipovic.

23            THE COURT:  Sure.

24            MR. FILIPOVIC:  Your Honor, with respect to a

25    recommendation to the Bureau of Prisons as to the place of

1  confinement, I have consulted with Mr. Bowser, and he's asking

2  for a recommendation for FDC SeaTac because it's what he knows

3  and the travel has been particularly difficult for him.  So he's

4  hoping that he can stay there.

5          THE COURT:  Yeah.  It's possible, given the amount of

6  time he's already served and the amount remaining, that he could

7  stay at SeaTac.  I don't absolutely control that, but I would be

8  happy to add a recommendation that he remain at FDC SeaTac.  You

9  can put that in, Mr. Filipovic.

10         MR. FILIPOVIC:  Thank you, Your Honor.

11         THE COURT:  Mr. Bowser, it's just a recommendation.  The

12  Bureau of Prisons will make their decision on that.

13         THE DEFENDANT:  I understand that.

14         MR. FILIPOVIC:  Your Honor, I have reviewed the proposed

15  judgment.  It accurately reflects the court's sentence.

16         THE COURT:  Ms. Whaley, do you want to look at it, or

17  are you okay with it?

18         MS. WHALEY:  I will look at it.

19         THE COURT:  Okay.  And then, Ms. Whaley, you bring it

20  up.

21      You know, Amelia Whaley is an attorney.  Did you know that,

22  Mike?

23         MR. FILIPOVIC:  I did, Your Honor.

24         THE COURT:  Yeah.

25      That's really putting your law degree to good use, I'd say.

1    MS. WHALEY:  I agree, Your Honor.

2    Your Honor, may I approach?

3    THE COURT:  Yes, please do, Ms. Whaley.  Does it seems

4    to reflect the court's ruling?

5    MS. WHALEY:  Yes.

6    THE COURT:  Thank you.

7    Okay.  I have signed the judgment in the case.  And as I

8    said, I signed an order granting a motion to seal also.  And I

9    will put those there for Ashleigh.

10   Mr. Bowser, you know, what you do going forward will define

11   your life, not what you have done looking back.  And you have

12   made a good start on making amends for what you did to the world,

13   to the companies, to the individuals, and you also need to come

14   to terms with your own life.  As you say, you've had some

15   traumas, you've had some difficulties.  Work on staying off

16   alcohol, work on dealing with the trauma and, you know, the

17   post-traumatic stress that you probably have undergone here.  But

18   you can still do a lot to make your life meaningful and help the

19   people around you.  So good luck to you going forward.

20   Thank you very much, counsel, to the Entertainment Software

21   Association, and to Nintendo.  Thank you so much for your

22   participation.

23   And, Mr. Filipovic, farewell and take good care of yourself.

24   MR. FILIPOVIC:  Thank you, Your Honor.

25   THE COURT:  Thank you.

1      We are adjourned.

2

3                      (Adjourned.)

4

5                 C E R T I F I C A T E

6

7      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

8  United States District Court in the Western District of

9  Washington at Seattle, do certify that the foregoing is a correct

10  transcript, to the best of my ability, from the record of

11  proceedings in the above-entitled matter.

12

13

14                     /s/ Nickoline Drury

15                     Nickoline Drury

16

17

18

19

20

21

22

23

24

25